UNITED STATES of America,

v.

Esteban GONZALEZ and Alfredo Colon, Defendants.

No. 94 Cr. 134 (PKL).

United States District Court, S.D. New York.

Oct. 12, 1994.

Richard Owens, U.S. Attys. Office, New York City, for U.S.

Pat Stiso, New York City, for defendant Esteban Gonzalez.

Hal Meyerson, Meyerson & Ramos, New York City, for defendant Alfredo Colon.

## *MEMORANDUM ORDER*

LEISURE, District Judge:

On March 16, 1994, a grand jury sitting in the Southern District of New York charged defendants Esteban Gonzalez ("Gonzalez") and Alfredo Colon ("Colon") (collectively "defendants") each with violating 18 U.S.C. § 922(g)(1). This statute, in substance, makes it a federal crime for a convicted felon to possess a firearm that has travelled in interstate commerce. On April 8, 1994, the Government filed a prior felony information notifying Gonzalez that the sentencing enhancement under 18 U.S.C. § 924(e) may be applicable in his case.

Defendants filed an array of pretrial motions. Colon's motions sought: (1) a severance of his trial from that of his co-defendant; (2) suppression of his statements to law enforcement officials because he did not receive *Miranda* warnings or because his statements were coerced; (3) suppression of certain evidence against him because he was arrested without probable cause; (4) additional discovery, including *Brady* material; and (5) permission to join in motions of his co-defendant that are not inconsistent with the relief that he sought.

Gonzalez's motions sought: (1) a severance of his trial from that of his co-defendant; (2) an order (a) bifurcating his trial, or (b) requiring the Government to stipulate to satisfaction of the "prior felony conviction" element of § 922(g)(1), or (c) requiring the Government to stipulate the fact of his prior felony conviction; (3) an order barring the Government from presenting evidence at trial of his prior similar acts; (4) suppression of

his statements to law enforcement officials because the statements were made prior to *Miranda* warnings or were involuntary; (5) suppression of identification evidence against him because the police used an impermissibly suggestive show-up procedure; (6) suppression of evidence against him because he was arrested without probable cause; (7) permission to join in motions of his co-defendant that are not inconsistent with the relief that he sought; and (8) permission to bring additional motions.

On September 20 and 21, 1994, the Court heard evidence on five issues: (1) whether Colon was arrested without probable cause; (2) whether Colon's statements to law enforcement officials are admissible; (3) whether Gonzalez was arrested without probable cause; (4) whether a show-up identification of Gonzalez was impermissibly suggestive; and (5) whether Gonzalez's statements to law enforcement officials are admissible. Two witnesses testified at the hearing: Officer Thomas Crowe ("Officer Crowe") of the New York City Police Department ("N.Y.P.D."), and Officer Ralph Argiento ("Officer Argiento"), also of the N.Y.P.D. At the close of the hearing, the Court reserved judgment on the five issues as to which evidence was presented, and ruled from the bench on defendants' other motions. *See* Suppression Hearing Transcript ("Transcript") at 193–210.[1]

## DISCUSSION

The Court has considered defendants' remaining motions in light of the record developed to date. For the reasons stated below, Colon's motion to suppress evidence on the ground that he was arrested without probable cause is denied. Colon's motion to suppress his statements to law enforcement officials is denied in part and granted in part. Gonzalez's motion to suppress evidence on the ground that he was arrested without probable cause is denied. Gonzalez's motion to suppress identification evidence against

---

1. At the hearing, the Court did not formally rule on either defendant's motion to join in motions of his co-defendant that are not inconsistent with the relief that he seeks. *See* Transcript at 197–98. The Court grants each defendant's motion to join in motions of his co-defendant that are not inconsistent with the relief that he seeks and denies to each defendant any relief that the Court denied to his co-defendant, for the reasons stated in the Court's ruling from the bench on September 21, 1994. *See id.* at 193–200.

him is denied. Gonzalez's motion to suppress his statements to law enforcement officials is denied in part and granted in part.

## I. PROBABLE CAUSE TO ARREST COLON.

Colon argues that he was arrested without probable cause. In support of his contention, he has submitted an affidavit in which he generally denies Officer Crowe's allegations against him and specifically denies Officer Crowe's allegation that Officer Crowe saw him and Gonzalez each in possession of a firearm on the night in question. The Government responds that Officer Crowe's testimony against Colon at the suppression hearing was credible and is sufficient to establish probable cause.

" '[T]o establish probable cause, it is not necessary to make a prima facie showing of criminal activity or to demonstrate that it is more probable than not that a crime has been or is being committed.' " *United States v. Jimenez,* 824 F.Supp. 351, 371 (S.D.N.Y. 1993) (quoting *United States v. Cruz,* 834 F.2d 47, 50 (2d Cir.1987) (citation omitted), *cert. denied,* 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988)). Instead, "[p]robable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Patrick,* 899 F.2d 169, 171 (2d Cir.1990). Put simply, " '[p]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.' " *Jimenez,* 824 F.Supp. at 369–70 (quoting *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983)).

■ The Court finds that these standards are amply satisfied here. At the suppression hearing, Officer Crowe credibly testified to the following: As he returned home from McDonald's on the evening in question, Officer Crowe saw Colon walking up the walkway in front of Officer Crowe's home. *See* Transcript at 13. When Officer Crowe entered his driveway and Colon saw him, Colon "raised his hands in the air in kind of a gesture like . . . oh, wrong house." *Id.* Colon then left Officer Crowe's walkway and proceeded away from Officer Crowe's home. *See id.* at 14. However, Colon did not approach either of the neighboring homes; instead, he walked up and down the street. *See id.* This behavior aroused Officer Crowe's suspicions. *See id.*

After entering his home, Officer Crowe observed two vehicles approach, each operating without headlights. *Id.* at 14–16. One was "a white Chevy Corsica," the other, "a red Chevy Beretta, two tone, blue—maroon and silver." *Id.* at 16. Each driver exited the vehicle that he was driving, and Colon and the two drivers talked with one another. *See id.* at 16–18. The driver of the red and silver Beretta was defendant Esteban Gonzalez. *See id.* at 18–19. After a brief conversation, Gonzalez and the driver of the Corsica entered their vehicles and drove away, each vehicle again operating without headlights. *See id.* at 19. Colon, however, "remained in the area . . . still pacing up and down the block." *Id.* at 21.

Officer Crowe then "observed . . . Gonzalez enter the block . . . [and] walk up . . . along the sidewalk in the general direction of . . . Colon." *Id.* Gonzalez and Colon engaged in another brief conversation, then "began to walk up the block along [a] fence line . . . and . . . crouch down. . . ." *Id.* at 22. Officer Crowe called 911. *See id.* Officer Crowe then "noticed that [Colon and Gonzalez] hastily ran out from the sidewalk . . . and began to hide behind a parked car." *Id.* at 23. At this point, Officer Crowe decided to "come outside and take some kind of police action." *Id.* at 24.

From the walkway in front of his house, Officer Crowe observed each defendant "brandish a single firearm . . . hold [it] down to [his] side and . . . crouch down behind the parked vehicles." *Id.* at 24. "[B]oth males [then] turned and started to run in [Officer Crowe's] direction looking [back] over their shoulders. . . ." *Id.* at 24–25. Officer Crowe "yelled out, 'Police, don't move.' " *Id.* at 26. Gonzalez then "raised his firearm . . . across his body" and "fire[d] one shot in [Officer

Crowe's] direction." *Id.* at 26–27. Officer Crowe responded with two shots. *See id.* at 27. Gonzalez and Colon then ran into a driveway area, where each discarded a weapon. *See id.* at 27–28. The two then exited the driveway and fled the scene on foot. *See id.* at 28.

Officer Crowe gave "chase ... yelling that [he] was a police officer, to stop." *Id.* As Gonzalez and Colon were fleeing, Officer Crowe "observed ... that ... Gonzalez now had in his hand a second firearm...." *Id.* at 29. Officer Crowe caught Colon, but Gonzalez escaped on foot. *See id.*

In light of the Court's finding that Officer Crowe's testimony to the foregoing was credible, the conclusion that there was probable cause to arrest Colon is inescapable. *See Sibron v. New York*, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904–05, 20 L.Ed.2d 917 (1968) ("It is difficult to conceive of stronger grounds for an arrest, short of actual eyewitness observation of criminal activity," than where an off-duty police officer in his apartment "heard strange noises at his door which apparently led him to believe that someone sought to force entry. When he investigated these noises he saw two men, whom he had never seen before in his 12 years in the building, tiptoeing furtively about the hallway.... And when [the officer] entered the hallway, the men fled down the stairs.").

At the suppression hearing, Colon asserted, through counsel, that Officer Crowe's testimony against Colon was not credible because it was materially inconsistent with statements that Officer Crowe had given on other occasions. *See, e.g.,* Transcript at 81, 210–20 (arguing that Officer Crowe's testimony was made from "whole cloth"). Colon's counsel relied, in particular, on differences between Officer Crowe's testimony at the

suppression hearing and the account that Officer Crowe gave relating to at least some aspects of this incident at a police inquiry into the circumstances surrounding his discharge of his weapon. *See, e.g., id.* at 48–51 (concerning whether Officer Crowe saw two or three individuals in a White Corsica earlier in evening); *id.* at 67–72 (concerning whether Officer Crowe was at his front window or in front of his house when he first observed Gonzalez and Colon draw guns); *id.* at 83–87 (concerning whether Gonzalez and Colon were on sidewalk or in street when Gonzalez fired at Officer Crowe). Colon's counsel relied to a lesser extent on differences between Officer Crowe's testimony at the suppression hearing and his testimony before the grand jury in this matter. *See, e.g., id.* at 60–64 (concerning whether or not Officer Crowe had retrieved his revolver yet, when he observed Colon talking with the drivers of the Corsica and Beretta that approached and left with their headlights off).[2]

However, since observing Officer Crowe testify at the suppression hearing, the Court has thoroughly reviewed the record in this case, including the suppression hearing transcript, photographs introduced at the suppression hearing, the minutes of the police inquiry, Officer Crowe's grand jury testimony, and the affidavits of Gonzalez and Colon. On the present record, the Court finds that Colon's broadside attack on Officer Crowe's credibility is without merit, at least for purposes of the probable cause inquiry. The points that counsel raised were either wholly collateral to the probable cause determination, *see id.* at 48–51, 60–64, 101–03, 132–33, or did not undermine Officer Crowe's credibility significantly for probable cause purposes, *see id.* at 67–72; 83–87; 96–98.[3]

---

**2.** Gonzalez's counsel also attempted to develop material differences between Officer Crowe's testimony at the suppression hearing and his account at the police inquiry, *see, e.g., id.* at 95–97 (concerning whether or not Officer Crowe had exited his house yet when he first observed Gonzalez and Colon draw guns); 102–03 (concerning whether or not Gonzalez and Colon "bumbled" into each other when they discarded their firearms); and between Officer Crowe's testimony at the suppression hearing and his testimony before the grand jury, *see, e.g., id.* at 96–98 (concerning whether or not Officer Crowe had exited his

house yet when he first observed Gonzalez and Colon draw guns); 101–03 (concerning whether or not Gonzalez and Colon "bumbled" into each other when they discarded their firearms); 132–33 (concerning whether Officer Crowe actually saw Gonzalez remove second gun from his waistband or merely saw him running with it as he fled).

**3.** The Court also notes that the circumstances under which Officer Crowe gave his account at the police inquiry were far from ideal for developing a thorough and precise record of the facts

Colon's motion to suppress evidence on the ground that he was arrested without probable cause is HEREBY DENIED.

## II. THE ADMISSIBILITY OF COLON'S STATEMENTS TO OFFICER CROWE.

Colon also argues that the Court should suppress his statements to Officer Crowe because they were made prior to *Miranda* warnings. At the suppression hearing, Colon, through counsel, also moved to suppress Colon's first statement to Officer Crowe because it was coerced. *See* Transcript at 91–92. The Government does not dispute that Colon's statements were made prior to *Miranda* warnings, but argues that they are admissible nevertheless.

If a defendant's statements to law enforcement officials are involuntary, they are inadmissible against him for any purpose. *See Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). A defendant's statements are deemed "involuntary" where "the totality of the circumstances" "caused the [defendant's] will to be overborne at the time he confessed." *Green v. Scully*, 850 F.2d 894, 900–02 (2d Cir.), *cert. denied*, 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988).

Moreover, the general rule is that a defendant's statements made during "custodial interrogation" are not admissible against him for use in the Government's case-in-chief, unless the Government "demonstrates that, prior to any questioning, the defendant was ' "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." ' " *United States v. Mitchell*, 966 F.2d 92, 97–98 (2d Cir.1992) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 428–29, 104 S.Ct. 3138, 3144, 82 L.Ed.2d 317

(1984) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966))). A detention becomes "custodial" for *Miranda* purposes when " 'a reasonable person in the defendant's position would have understood himself to be "subjected to restraints comparable to those associated with a formal arrest." ' " *United States v. Mussaleen*, 35 F.3d 692, 697 (2d Cir.1994) (quoting *Mitchell*, 966 F.2d at 98 (quoting *Berkemer*, 468 U.S. at 441, 104 S.Ct. at 3151)). Police conduct toward a defendant constitutes " 'interrogation' " for *Miranda* purposes where it involves " 'words or actions ... that the police should know are reasonably likely to elicit an incriminating response from a subject.' " *United States v. Colon*, 835 F.2d 27, 30 (2d Cir.1987) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980)), *cert. denied*, 485 U.S. 980, 108 S.Ct. 1279, 99 L.Ed.2d 490 (1988).

However, the general rule notwithstanding, "there are limited circumstances where the judicially imposed strictures of *Miranda* are inapplicable." *New York v. Quarles*, 467 U.S. 649, 653 n. 3, 104 S.Ct. 2626, 2630 n. 3, 81 L.Ed.2d 550 (1984). In particular, a defendant's custodial statements are admissible against him where they are made in response to "questions reasonably prompted by a concern for the public safety." *Id.* at 656, 104 S.Ct. at 2632.[4] The reason is that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657, 104 S.Ct. at 2632.

The Government must prove "by a preponderance of the evidence" that a defendant's statements are admissible. *See generally United States v. Diaz*, 891 F.2d 1057, 1060 (2d Cir.1989) (Government must prove volun-

---

that underlie this prosecution. For example, Officer Crowe had worked a full shift beginning the morning of the incident. *See* Transcript at 6. And after the incident, which occurred shortly before midnight that evening, Officer Crowe was taken to the hospital to receive medical attention for minor injuries that he incurred during the incident. *See id.* at 48–49. The police inquiry did not begin until approximately 4:40 AM the

following calendar day. *See* Board Hearing at 1; *see also* Transcript at 48–49.

4. As the foregoing language implies, the applicability of the "public safety" exception to *Miranda* does not "depend on *post hoc* findings at a suppression hearing concerning the subjective motivation of the arresting officer." *Id.* at 655–56, 104 S.Ct. at 2631.

tariness of confession or waiver of Fifth Amendment rights by preponderance of evidence) (citations omitted).

The Court finds that the Government has carried its burden of proving that Colon's first three statements to Officer Crowe may be admitted against him without violating the Fifth Amendment.[5] At the suppression hearing, Officer Crowe credibly testified to the following: As he chased Gonzalez and Colon from the scene, he closed the "[d]istance ... between [hi]mself and ... Colon ... [s]o [that he] was able to catch up to ... Colon and strike him from behind and knock him to the ground and hold him down on the ground at gunpoint." Transcript at 29; *see also id.* at 91 (Officer Crowe struck the blow with his weapon; he wanted to subdue Colon; he held him in a wrist lock). At this point, before Officer Crowe said anything, Colon said, "Thank you, them guys were trying to kill me, those guys were trying to kill me.... I am a police officer." *Id.* at 29. Officer Crowe responded, "Where is your shield [i.e., badge]? Where do you work? Where is your shield?" *Id.* Colon said, "I work in the 52 precinct." *Id.* at 30. Officer Crowe expressed strong doubt about Colon's honesty in this respect. *See id.* Colon then said, "My brother works there." *Id.* Officer Crowe said, "What's your brother's name?" *Id.* Officer Crowe testified: Colon "couldn't come up with a name.... I don't recall what name he gave me, but I had worked in the 52 precinct for approximately six years and I am very familiar with everyone who works there, and know no one nor him to ever work in the 52 precinct...." *Id.*

■ Colon's first statement to Officer Crowe—that someone was trying to kill him and that he was a police officer—is admissible because it was made spontaneously, not in response to conduct by Officer Crowe amounting to "interrogation" or "coercion." As described above, Colon was fleeing the scene on foot when Officer Crowe caught him, and he may have been carrying a concealed weapon. Officer Crowe used no more

force against Colon than was necessary for the limited, lawful purpose of subduing him, thereby ensuring the safety of Officer Crowe and any bystanders. Prior to his first statement, "Colon was not questioned, confronted with evidence, or even encouraged to be honest and tell the facts. Colon initiated the conversation." *United States v. Colon,* 835 F.2d 27, 30 (2d Cir.1987), *cert. denied,* 485 U.S. 980, 108 S.Ct. 1279, 99 L.Ed.2d 490 (1988). Under the circumstances, Colon's argument that his first statement was "coerced" assumes that a suspect may speak (indeed, misrepresent himself as a police officer) with impunity whenever it becomes necessary to use force to bring him into custody. But the Court finds this proposition untenable. Considering the totality of the circumstances,[6] the Court finds that Colon's first statement was voluntary.

Colon's *Miranda* argument fails for a similar reason: " '[o]nly questioning that reflects a measure of compulsion above and beyond that inherent in custody itself constitutes interrogation the fruits of which may be received only after *Miranda* warnings have been given.' " *United States v. Cota,* 953 F.2d 753, 758 (2d Cir.1992) (quoting *United States v. Morales,* 834 F.2d 35, 38 (2d Cir. 1987)). But prior to Colon's first statement, nothing in Officer Crowe's conduct toward him was " 'reasonably likely to elicit an incriminating response.' " *See id.* at 759 (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980)). As a result, Colon's first statement may be admitted against him.

■ Colon's second and third statements to Officer Crowe—that Colon worked in the 52 precinct and that his brother worked there—are also admissible against him, because they were made in response to "express questioning or its functional equivalent," *Cota,* 953 F.2d at 759, that was "reasonably prompted by a concern for the public safety." *See New York v. Quarles,* 467 U.S. 649, 656, 104 S.Ct. 2626, 2631–32, 81 L.Ed.2d 550 (1984). Officer Crowe's "interrogation"

**5.** The Court has not considered the admissibility of Colon's statements under the Federal Rules of Evidence.

**6.** The Court notes Colon's prior felony conviction. *See* Government's Memorandum of Law in Opposition, Exhibit A at 3 ¶ 5.

of Colon prior to his second and third statements was directed toward determining immediately whether Colon was, in fact, a police officer.[7] Had Colon's representations to this effect been true, not only would there have been no need for Officer Crowe to continue to detain Colon, Officer Crowe and Colon could together have immediately pursued Gonzalez, who was armed with a second gun and was fleeing the scene on foot. The immediate apprehension of Gonzalez, who had just fired a shot at Officer Crowe, was of obvious importance to the public safety, and perhaps could have been accomplished had Officer Crowe succeeded in verifying Colon's representations. Under the circumstances, the Court finds that Colon's second and third statements to Officer Crowe are also admissible. *See, e.g., Fleming v. Collins,* 954 F.2d 1109, 1113 (5th Cir.1992) *(en banc)* (defendant's statements admissible under *Quarles* where officer questioned defendant in "still-volatile situation" and did not yet know whether defendant was "victim or perpetrator of an offense").

■ The Court finds, however, that any later statements that Colon may have made to Officer Crowe are not admissible for use in the Government's case-in-chief. Officer Crowe's testimony is ambiguous as to whether Colon responded to Officer Crowe's question, "What's your brother's name?" *See* Transcript at 30. Assuming, however, that he did, his answer is inadmissible. At this point, Colon had not received *Miranda* warnings, he was in Officer Crowe's custody, and he made the statement in response to a question from Officer Crowe. Moreover, there was no public safety interest in determining immediately whether Colon's brother was a police officer, because Colon's brother was not positioned to assist in the immediate apprehension of Gonzalez. As a result, under *Miranda* and its progeny, this statement and any that followed it are not admissible against Colon for use in the Government's case-in-chief.

Colon's motion to suppress his statements to law enforcement officials is HEREBY DENIED as to his first three statements to Officer Crowe. Colon's motion is HEREBY GRANTED as to any statements that followed, for use in the Government's case-in-chief.

## III. PROBABLE CAUSE TO ARREST GONZALEZ.

Gonzalez also argues that he was arrested without probable cause. More specifically, Gonzalez argues that the conduct toward him of the police officers who stopped him in the Beretta quickly ripened into a *de facto* arrest; but there was not probable cause to arrest him, Gonzalez contends, at least until Officer Crowe arrived at the scene and identified him several minutes later. In support of his motion, Gonzalez has submitted an affidavit in which he states that after the police officers stopped his vehicle: "I was immediately dragged out of the car … by officers who had there [sic] guns drawn. I was thrown to the ground and then handcuffed behind my back. I was picked up roughly and thrown against the car.… The[ ] … officers that arrested me … held me against the car and simultaneously requested a description of the perpetrator and a show-up identification over their radio." Gonzalez Affidavit at ¶¶ 1–2.

The Government responds that the officers who stopped Gonzalez' car merely detained him pursuant to the principles established in *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880–81, 20 L.Ed.2d 889 (1968), until they had probable cause to arrest him. The Government argued at the suppression hearing that the officers had probable cause to arrest Gonzalez by the time they received a description of his person and clothing over the police radio only moments after they stopped his vehicle.

Under *Terry,* a "police officer may, in appropriate circumstances and in an appropriate manner, stop a person for purposes of investigating possibly criminal behavior, even

---

**7.** Officer Crowe may have harbored subjective doubts about the truth of Colon's representations from the outset. However, from an objective as well as a subjective standpoint, Officer Crowe took Colon's representations seriously enough to attempt immediately to verify them. The Court finds this sufficient under *Quarles. See id.,* 467 U.S. at 656, 104 S.Ct. at 2631–32.

though there is no probable cause to make an arrest." *United States v. Bold,* 19 F.3d 99, 102 (2d Cir.1994) (citing *Terry,* 392 U.S. at 22, 88 S.Ct. at 1880); *accord United States v. Walker,* 7 F.3d 26, 29 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1201, 127 L.Ed.2d 549 (1994). The reason, in the context of a car-stop, is that "the governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts, may outweigh the Fourth Amendment interest of the driver and passengers in remaining secure from the intrusion." *United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985) (citation omitted). "Reasonable suspicion" arises when an officer "can point to 'specific and articulable facts which, taken together with rational inferences from those facts,' would 'warrant a man of reasonable caution in the belief' that a brief investigative stop is appropriate." *United States v. Jaramillo,* 25 F.3d 1146, 1150 (2d Cir.1994) (quoting *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880 (citation omitted)).

A *Terry*-stop's intrusiveness must be " 'reasonably related in scope to the circumstances which justified it initially.' " *United States v. Hooper,* 935 F.2d 484, 494 (2d Cir. 1991) (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985)). Otherwise, the stop "ceases to be a *Terry* type detention ... and instead becomes a seizure that requires a showing of probable cause." *Id.* (citation omitted). But the "fact that agents have used their cars to block a vehicle does not necessarily mean that, instead of a *Terry* stop, there was a de facto arrest." *United States v. Perea,* 986 F.2d 633, 644 (2d Cir. 1993) (citing *United States v. Lechuga,* 925 F.2d 1035, 1041 (7th Cir.1991) (no arrest where two cars involved in stop); *United States v. Jackson,* 918 F.2d 236, 238 (1st Cir.1990) (same)).

"Nor does the fact that ... officers approached a stopped car with guns drawn in order to protect themselves and bystanders on the street necessarily transmute a *Terry* stop into an arrest." *Perea,* 986 F.2d at 644 (citation omitted). Rather, a "law enforcement agent, faced with the possibility of dan-

ger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." *United States v. Alexander,* 907 F.2d 269, 272–73 (2d Cir.1990) (because "a car-stop is especially hazardous and supports the need for added safeguards ... [it was not] unreasonable [for] ... officers ... [to] unholster[ ] their guns and frisk[ ]" a driver suspected of drug trafficking) (citing *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)); *see also United States v. Jaramillo,* 25 F.3d 1146, 1150–51 (2d Cir.1994) (officer conducting car-stop "may 'take steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him' ") (quoting *Terry,* 392 U.S. at 23, 88 S.Ct. at 1881). In addition, "the totality-of-the-circumstances test for determining [whether] reasonable suspicion [exists] should include consideration of the possibility [that the suspect is in] possession of a gun, and the [corresponding] government[ ] need for a prompt investigation." *Bold,* 19 F.3d at 104; *compare United States v. Ceballos,* 654 F.2d 177, 184 (2d Cir.1981) (police conduct amounted to arrest where three police vehicles were involved in car-stop and, without justification, officers approached suspect's vehicle with guns drawn).

The Court finds that Gonzalez was not arrested without probable cause. At the suppression hearing, Officer Argiento credibly testified to the following: On the night in question, Officer Argiento and his partner, Officer Trufi, began to follow Gonzalez' vehicle after Officer Argiento heard the vehicle's description "given over from a burglary and a possible auto break in," and Officer Argiento to "observed the vehicle traveling ... at a high rate of speed." Transcript at 136; *see also id.* at 157; N.Y.P.D. Radio Transmissions ("Radio Transmissions") at 9, 17, 22. Then, working in tandem with a single marked police vehicle, Officers Argiento and Trufi pulled Gonzalez over. *See* Transcript at 136–37; *see also* Radio Transmissions at 22.

All of the police officers then got out of their cars, and Officer Argiento approached

Gonzalez' vehicle from the driver's side, *see* Transcript at 137, with his weapon drawn, *see id.* at 157. Officer Argiento asked Gonzalez to put the car in park and turn off the engine. *See id.* at 137. Gonzalez complied. *See id.* Now with his weapon at his side, *see id.* at 158, Officer Argiento opened up the driver door and asked Gonzalez to step out of the vehicle. *See id.* at 137.[8] As Gonzalez was doing so, Officer Argiento "placed his hand on [Gonzalez'] heart, his heart had a heavy heartbeat." *Id.* When Gonzalez got out of the vehicle, Officer Argiento put his gun back in its holster. *Id.* at 158.

Officer Argiento then "walked [Gonzalez] to the rear of the vehicle," *id.* at 138, directing him "with [his] voice, not with [his] weapon," *id.* at 158. When Officer Argiento asked Gonzalez where he had been, Gonzalez "said he was coming from a friend's house in Throgs Neck ... [but] he didn't know a street name or number." *Id.* at 138. Officers Argiento and Trufi then "put over the police radio that [they] had the vehicle stopped and [asked] if [anyone] had any further description on the [suspect]." *Id.* at 138; *see also* Radio Transmissions at 23. Officer Argiento testified: "Over the police radio [came] the description of a male white or Hispanic with a mustache and a—I believe it was a Carhardt-type jacket, type work jacket." Transcript at 138; *see also* Radio Transmissions at 5, 9, 24. Officer Argiento "then realized that [Gonzalez] was in fact a male Hispanic with [a] mustache wearing a Carhardt-type shirt." Transcript at 138–39.

At this point, Officer Argiento asked over the police radio whether someone was able to identify Gonzalez. *See id.; see also* Radio Transmissions at 24–25. He was informed that someone was on the way. *See* Transcript at 139; *see also* Radio Transmissions at 25–26. "[A]pproximately 15 to 20 minutes" later, Officer Crowe was brought to the scene, where he identified Gonzalez to Officer Argiento. *See* Transcript at 139. Officer Argiento signalled this fact to Officer Trufi, who was standing next to Gonzalez. *See id.* Officer Trufi then placed Gonzalez under arrest. *See id.* at 139–40.

The Court finds that there was probable cause to arrest Gonzalez by the time the final description of his person and clothing came over the police radio. At that point, the officers had "reasonably trustworthy information" to the effect that a red and silver Chevy Beretta, driven by a white or Hispanic male with a mustache and wearing a Carhardt jacket, had been involved in a burglary and auto break-in in the Throgs Neck section of the Bronx. The officers had "knowledge" that Gonzalez's person, clothing, and vehicle matched the descriptions given over the police radio; that Gonzalez manifested a heavy heart beat; and that Gonzalez had represented that he had been visiting a friend in Throgs Neck but could not provide a street name or number. "[T]he totality of the[se] circumstances as appraised by experienced [law] ... enforcement agents," *United States v. Cruz,* 834 F.2d 47, 51 (2d Cir.1987), *cert. denied,* 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988), amounted to "a probability or substantial chance of criminal activity" sufficient to establish probable cause to arrest, *see Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983).

Prior to this point in time, the officers' conduct toward Gonzalez, as credibly recounted by Officer Argiento, had not ripened into a *de facto* arrest. Only two cars participated in the stop of Gonzalez's vehicle, and Officer Argiento had ample reason based on the police radio transmissions to approach Gonzalez's door with his weapon drawn. *See* Radio Transmissions at 8, 10, 12–13 (advising that each of the other two persons connected with this incident had a gun). In addition, when Gonzalez exited the vehicle, substantially reducing the risk to the officers and any bystanders, Officer Argiento put his gun away. And by immediately asking Gonzalez where he had been and requesting a description of the suspect over the radio, Officer Argiento "diligently pursued a means of investigation that was likely to confirm or dispel [the officers'] suspicions quickly." *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). Finally, after hearing Gonzalez state that he

---

**8.** Officer Argiento did not ask Gonzalez for his license or for other information. *Id.* at 158.

did not know the street name or number where he had allegedly been in Throgs Neck, and realizing that Gonzalez's person and clothing matched the descriptions given over the police radio, Officer Argiento had probable cause to arrest Gonzalez.

Under these circumstances, the Court finds that Gonzalez's statement to Officer Argiento—that he had been visiting a friend in Throgs Neck but that he did not know a street name or number—may be admitted against him without violating the Fifth Amendment. When Gonzalez made this statement, he had been required to turn off and exit his vehicle and walk to its rear. But Officer Argiento put his weapon away before asking Gonzalez where he had been, and Gonzalez had not yet been handcuffed or frisked, nor had he been required to enter into one of the police vehicles. Considering the totality of the circumstances,[9] Gonzalez's will to resist making this statement was not overborne, and the statement, therefore, was "voluntary." Furthermore, in this context, " 'a reasonable person in [Gonzalez's] position would [not] have understood himself to be "subjected to ... restraints comparable to those associated with a formal arrest." ' " *Mussaleen*, 35 F.3d at 697 (2d Cir.1994) (quoting *Mitchell*, 966 F.2d at 98 (quoting *Berkemer*, 468 U.S. at 441–42, 104 S.Ct. at 3151)). Therefore, although Gonzalez was lawfully "seized" for Fourth Amendment pur-

poses, pursuant to *Terry*, when he made this statement, he was not yet "in custody" for Fifth Amendment purposes, pursuant to *Miranda* and its progeny.[10] As a result, the Fifth Amendment does not require suppression of this statement.

Gonzalez's motion to suppress evidence on the ground that he was arrested without probable cause is HEREBY DENIED.

## IV. THE SHOW–UP IDENTIFICATION OF GONZALEZ.

Gonzalez further argues that the show-up procedure that the police used to identify him was impermissibly suggestive. The Government disagrees, relying on *United States v. Bautista*, 23 F.3d 726 (2d Cir.1994), *cert. denied, Minier–Contreras v. U.S.*, — U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994).

The Second Circuit held in *Bautista* that an out-of-court identification was not rendered "unnecessarily (or impermissibly) suggestive" by the fact that the suspect was presented to the identifying witness "handcuffed, in the custody of law enforcement officers, and illuminated by flashlights." *Id.* at 729–30 (footnote omitted). Rather, these "were all necessary incidents of an on-the-scene identification immediately following a night-time narcotics raid. Because the on-the-scene identification was necessary to allow the officers to release the innocent, the incidents of that identification were also nec-

**9.** The Court notes Gonzalez's several previous encounters with the police. *See* Government's Memorandum of Law in Opposition at 28 n. 6; *id.* Exhibit A at 3 ¶ 4.

**10.** *See, e.g., U.S. v. Bengivenga*, 845 F.2d 593, 597–600 (5th Cir.) (*en banc* ) ("a Fourth Amendment seizure does not necessarily render a person in custody for purposes of *Miranda* ") (holding admissible defendant's statements made during *Terry* stop and prior to *Miranda* warnings), *cert. denied*, 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988); *U.S. v. Streifel*, 781 F.2d 953, 957–62 (1st Cir.1986) ("As a general rule, *Terry* stops do not implicate the requirements of *Miranda*....") ("That [defendants] were asked to turn their motors off and step out of their vehicles ... did not render them in custody"); *U.S. v. Manbeck*, 744 F.2d 360, 375–380 (4th Cir.1984) (holding admissible defendant's statements made during *Terry* stop and prior to *Miranda* warnings) ("This Court has already rejected the notion that officers transform a *Terry* stop

into an arrest by virtue of blocking the progress of a vehicle and drawing their weapons when approaching.") (citation omitted), *cert. denied, O'Hare v. U.S.*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985); *U.S. v. Bautista*, 684 F.2d 1286, 1291 (9th Cir.1982) ("*Terry* stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda* warnings.") (holding admissible defendants' statements made while handcuffed during *Terry* stop and prior to *Miranda* warnings), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446, 447 (1983); *compare U.S. v. Perdue*, 8 F.3d 1455, 1461–65 (10th Cir.1993) (defendant's statements during valid *Terry* stop inadmissible because, under circumstances, defendant was in "custody" for *Miranda* purposes: defendant "was forced out of his car and onto the ground at gunpoint ... then questioned ... while police helicopters hovered above ... [and] the officers kept their guns drawn on him").

essary." *Id.* at 730. Indeed, the Second Circuit noted, the participating officers "might [be] commend[ed] . . . for their immediate efforts to ascertain and release innocent people." *Id.* at 730 n. 6.

■ The Court finds that the show-up procedure used in this case was not "unnecessarily" or "impermissibly" suggestive. At the suppression hearing, Officer Crowe credibly testified to the following: While still in front of his home, he provided the officers who had arrived on the scene "a more detailed and thorough description" of Gonzalez and a description of his vehicle. Transcript at 40 (describing vehicle as "a red maroon Beretta, maroon and silver Beretta with New York plates"). "Approximately 25 minutes to a half hour later," Officer Crowe was informed that a "vehicle . . . matching the description" that he had provided had been stopped. *Id.* at 40–41. He was then driven by other officers to the site of the stop. *See id.* at 41. As his car approached the scene, he "could see . . . a vehicle which looked like the one . . . [he] had seen earlier . . . and towards the back of that vehicle [he] observed a male with his hands up on the rear trunk." *Id.* It appeared to Officer Crowe that police officers were standing behind "the male," detaining him *Id.* at 129–30. Officer Crowe testified: "As we got closer, I was able to ascertain and to see that this was in fact the male . . . who had fired the shot at me and who I had seen earlier in the night in several different conversations." *Id.* at 41. Officer Crowe then "stated to the two officers in the car . . . 'That's the guy.' " *Id.* After exiting his vehicle and walking to within "two or three arm lengths" of Gonzalez, Officer Crowe said, " 'That's definitely him.' " *Id.;* *see also id.* at 139 (testimony of Officer Argiento: Officer Crowe "identified [Gonzalez] by his face, his shirt, and . . . his boots").

Here, as in *Bautista*, the suspect was presented to the identifying witness at night and in the presence of law enforcement officers. Notably absent from this case, however, are two of the suggestive circumstances that were present in *Bautista*. The suspect here was not presented to the identifying witness in handcuffs, nor with his face illuminated by flashlights. Moreover, the identifying witness in this case was an off-duty police officer, with training and experience in identifying suspects.

Gonzalez argues, nevertheless, that the procedure used in this case was impermissibly suggestive because he was standing with his hands on the trunk of the red and silver Beretta when Officer Crowe identified him. The Court disagrees. As described above, just a few minutes earlier, Officer Crowe had described the vehicle that the police should search for as a red and silver Chevy Beretta, and before Officer Crowe reached the scene of the show-up he was informed that a vehicle meeting the description that he provided had been stopped. These facts raise no issues of impermissible suggestiveness because they do not distinguish this case from any other where a witness is called to identify a suspect about whom the witness has previously provided identifying information. But against this backdrop, letting Officer Crowe see Gonzalez with his hands on the trunk of the stopped vehicle could result in, at most, a marginal increase in suggestiveness. Moreover, any increase in suggestiveness that might have resulted from this procedure was a necessary incident to using a less intrusive means than handcuffs of safely detaining Gonzalez while awaiting Officer Crowe's arrival. *Cf.* Radio Transmissions at 24 (advising officers detaining Gonzalez that "he pulled a gun on [Officer Crowe] and there might be another gun in the car"). The Court therefore finds that the show-up identification in this case was not "unnecessarily" or "impermissibly" suggestive.

Gonzalez's motion to suppress identification evidence against him is HEREBY DENIED.

## V. THE ADMISSIBILITY OF GONZALEZ'S CUSTODIAL STATEMENTS.

Gonzalez argues that his custodial statements should be suppressed because they were made prior to *Miranda* warnings and, in any event, were involuntary. The Government responds that Gonzalez's custodial statements were voluntary and were not

made in response to interrogation.[11]

The principles of law that govern the admissibility of these statements have been set forth above. *See supra* Part II. The Court therefore proceeds directly to the application of those principles to the facts as found by the Court.

## A. Voluntariness

■ The Court first finds that the Government has proved by a preponderance of the evidence that, considering the totality of the circumstances, all of Gonzalez's custodial statements were voluntary. At the suppression hearing, Officer Argiento credibly testified to the following: He and Officer Trufi drove Gonzalez from the scene of the show-up identification to the 45 precinct, where they all remained for approximately six hours. *See* Transcript at 140–41. There, Officers Argiento and Trufi awaited instructions from their superior officers who had come to the precinct to investigate the circumstances surrounding Officer Crowe's discharge of his weapon. *See id.* at 141–42. During this period, Gonzalez was seated in a chair in a public room of the precinct, handcuffed to a plumbing pipe. *See id.* at 140.

Gonzalez was held in this room because each of the other two suspects involved in the incident had already been placed in one of only two other holding areas in the 45 precinct, and the police wanted to keep the three suspects separated from one another during questioning. *See id.* at 163–66.[12]

Officers Argiento and Trufi then transported Gonzalez by car from the 45 precinct to Bronx Central Booking ("Central Booking"). *See id.* at 143. Upon arrival there, Officers Argiento and Trufi took Gonzalez and Colon to a room where two pictures were taken of each defendant. *See id.* at 143–44. The Government introduced into evidence at the hearing a photograph that, according to Officer Argiento's credible testimony, fairly and accurately depicts Gonzalez's shoulder area and face "at the time that [Officer Argiento] had him at Central Booking," Government's Exhibit 11 ("GX 11"). GX 11 gives no indication that Gonzalez had as yet fallen victim to foul play at the hands of anyone, much less the police. Gonzalez remained in the custody of Officers Argiento and Trufi for approximately 15 to 20 minutes after the photographs of Gonzalez and Colon were taken. *See id.* at 144. Officers Trufi and Argiento

---

11. The Government and Gonzalez have brought five custodial statements to the Court's attention. *See Transcript at 146–47.* The Court's discussion below is limited to the admissibility of these statements under Fifth Amendment principles. The Court's discussion does not consider the extent to which these statements may or may not be admissible under the Federal Rules of Evidence.

12. Officer Argiento credibly testified that, contrary to an assertion in Gonzalez's affidavit, *see* Gonzalez Aff. at ¶ 7, the pipe to which Gonzalez was handcuffed was not a scalding hot radiator pipe, *see id.* at 182. Officer Argiento also credibly testified that Gonzalez did not voice any complaints about the circumstances of his custody. *See* Transcript at 142–43.

The Court finds that Officer Argiento's credibility on these points is bolstered, and Gonzalez's credibility (to the extent that the Court could evaluate it without observing him testify) is impeached, by the following. First, Officer Argiento credibly testified that the room in which Gonzalez was held in the precinct is not a cell but, rather, a public room "with soda machines and a desk, a staunchion [sic] that has a couple of chairs. It is a room where the officers gather before each tour and get their assignments." *Id.*

at 141; *see also* Gonzalez Aff. at ¶ 6 (describing place of custody at precinct as a "room," not an office or a cell). In addition, it is undisputed that during the period of Gonzalez's custody in the room, Officer Argiento's superior officers came to the precinct to investigate the circumstances surrounding Officer Crowe's discharge of his weapon, *see, e.g.,* Transcript at 142. Officer Argiento and Officer Trufi were waiting with Gonzalez at the 45 precinct for instructions from their superior officers on what actions they should take concerning the incident. *See id.* at 142. Under these circumstances, the Court finds it highly implausible that Officer Argiento would handcuff Gonzalez to a hot radiator pipe in a public room of the precinct.

Second, Gonzalez asserted in his affidavit that during his custody at the precinct, Officer Argiento "placed what appeared to be a .38 caliber revolver to. [Gonzalez's] head with the firing hammer cocked in the ready position." Gonzalez Aff. at ¶ 8. Yet Officer Crowe credibly testified that it is physically impossible to "cock" the types of guns that he and Officer Trufi were carrying on the evening in question. Transcript at 148. As a result, the Court concludes that, at least with respect to the foregoing points, Gonzalez has embellished upon the circumstances of an uncomfortable confinement.

388

then released custody of defendants to officers at Central Booking. *See id.* at 144–45.

Before they did so, however, an officer at Central Booking realized that Colon was wearing "a slip-over turtleneck blue sweatshirt with a ... New York City Housing Police Department patch on its chest." *Id.* at 145–46. Officer Argiento was informed by this officer that Colon "was not allowed to enter the court system with that particular shirt on," because allowing him to do so would pose a security risk. *Id.* at 145. At this point, Officer Argiento said to Gonzalez, referring to Colon: " 'You know him, right?' " *Id.* at 146. When Gonzalez answered that he did, Officer Argiento said, "You would not mind giving him one of your [two] shirts?" *Id.* Gonzalez said that he would not mind. *See id.*

Gonzalez and Colon then began to whisper to each other. *See id.* Upon Officer Argiento's request, they stopped for a few seconds, but quickly resumed talking, this time in Spanish. *See id.* Officer Argiento again asked them to stop talking. *See id.* When they did not, Officer Argiento "asked ... Gonzalez to go to the rear of the room and ... took Colon to the front of the room." *Id.* at 46–47. Gonzalez then said, in Officer Argiento's words, that Officer Argiento thought he was "a tough guy" because Gonzalez "had the cuffs on, take the cuffs off [and Officer Argiento] will see when [Gonzalez] gets out [that Gonzalez] will put two in [Officer Argiento]." *Id.* at 147. Officer Argiento responded, "Yes, yes, yes, yes, okay." *Id.* Gonzalez then stated again, "Yes, I will put two in you." *Id.* Gonzalez then made "a sexual statement against [Officer Argiento's] wife." *Id.*

The Court finds that all of these statements were voluntary. Officer Argiento

credibly testified that at no time on the evening in question did he engage, or threaten to engage, in any form of abusive conduct toward Gonzalez, nor did Officer Argiento observe anyone else do so. *See id.* at 147–48. Moreover, although Gonzalez may reasonably have found the circumstances of his earlier custody at the 45 precinct uncomfortable, the Court does not find that those circumstances in any way overbore Gonzalez's will to resist making the foregoing statements. Furthermore, although Gonzalez, through counsel, introduced into evidence at the hearing a photograph of himself in which his right forehead appears bruised and his nose appears swollen, *see* Defendant's Exhibit 7 ("DX 7"), neither Gonzalez's affidavit, nor the testimony elicited at the suppression hearing, provide a credible basis for a conclusion that DX 7 was taken (and, thus, the injuries were received) prior to his statements.[13] Finally, Gonzalez has had extensive prior experience with the criminal justice system, *see* Government's Memorandum of Law in Opposition at 28 & n. 6 (briefly describing circumstances of Gonzalez's three prior convictions, all upon plea of guilty, one for burglary and two for robbery); *id.* Exhibit A at 3 ¶ 4 (similar); and nothing about the circumstances or manner in which Officer Argiento conducted himself suggests that Gonzalez was tricked or deceived into incriminating himself.

Having considered the totality of the circumstances, the Court finds that all of Gonzalez's custodial statements were voluntary. These statements therefore may be used against him for impeachment purposes, without violating the Fifth Amendment.

**B.** *Miranda*

█ The Court finds, however, that the Government has failed to carry its burden of

---

**13.** GX 11, described above, tends to discredit Gonzalez's assertion in his affidavit that several officers slapped and punched him in the face during his custody in the room at the 45 precinct before Officers Argiento and Trufi transported him to Central Booking. *See* Gonzalez Aff. at ¶¶ 8–9. GX 11 thereby calls into question at least Gonzalez's memory as to the timing of the events he describes in his affidavit, if not the identity of the person(s) who inflicted these injuries on him.
  Officer Argiento credibly testified that he did not know when DX 7 was taken. *See* Transcript

at 152–54. Gonzalez's counsel, who offered DX 7, implied by his questioning that it was taken immediately before Gonzalez was arraigned. *See id.* at 153–54. The prosecutor put forward a similar understanding, that DX 7 was taken at some later point in the day, after Gonzalez had been confined for a period with other prisoners. *See id.* at 177–78. DX 7 therefore provides no basis for a conclusion that Gonzalez's statements were involuntary.

proving that Gonzalez received *Miranda* warnings after he was taken into custody. The Government has not offered an affidavit or testimony from anyone asserting that Gonzalez received *Miranda* warnings. Moreover, on cross-examination at the suppression hearing, Officer Argiento conceded that he was not aware that Gonzalez received *Miranda* warnings at any time on the evening in question. *See* Transcript at 166. Under the circumstances, Gonzalez's statements during "custodial interrogation" are not admissible against him as part of the Government's case-in-chief.

The Court finds, nevertheless, that only Gonzalez's first two statements—that he knew Colon and that he would be willing to give Colon a shirt—were made in response to police conduct amounting to "interrogation." As credibly recounted by Officer Argiento, Gonzalez's last three statements—which were directed against Officer Argiento and his wife personally, *see id.* at 147—were not made in response to police conduct that was "'reasonably likely to elicit an incriminating response from a suspect.'" *United States v. Colon,* 835 F.2d 27, 30 (2d Cir.1987) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980)), *cert. denied,* 485 U.S. 980, 108 S.Ct. 1279, 99 L.Ed.2d 490 (1988). As a result, only Gonzalez's first two statements are the fruit of a *Miranda* violation, and only those two statements are inadmissible against him during the Government's case-in-chief. Gonzalez's last three statements may be used against him for all purposes, without violating the Fifth Amendment.

Gonzalez's motion to suppress his custodial statements is HEREBY DENIED as to all statements, for impeachment purposes; HEREBY DENIED as to his last three statements, for use in the Government's case-in-chief; and HEREBY GRANTED as to his first two statements, for use in the Government's case-in-chief.

## VI. ADDENDUM TO THE COURT'S RULING ON SEVERANCE AND BIFURCATION.

The Court ruled from the bench that neither Gonzalez nor Colon is entitled to a severance of his trial from that of his co-defendant, nor is either entitled to a bifurcation of his trial such that the jury would not learn of his prior felony conviction before concluding that he had possessed a firearm on the evening in question. *See* Transcript at 193–98.

The Court takes this opportunity to explain why, in the Court's view, the Second Circuit's decision in *United States v. Jones,* 16 F.3d 487 (2d Cir.1994), does not call for a different conclusion here. In *Jones,* the Second Circuit held that, where a single defendant was charged with a felon-in-possession-of-a-weapon count and with counts charging other offenses, "the district court should have severed or, at least, bifurcated the felon in possession count" to avoid the effects of spillover prejudice. *Id.* at 492. The Second Circuit reasoned that a limiting instruction was insufficient to cure the effects of spillover prejudice because it would be beyond the capacity of jurors to put from their minds the fact that the defendant was a convicted felon when they considered whether he was guilty of the other charges against him. *Id.* at 492–93 (citations omitted).

The Court finds that *Jones* is inapposite here and that this case is controlled by the principles of severance and bifurcation discussed in the Court's bench ruling. The Second Circuit's concern in *Jones* was that a jury would hold a defendant's own prior felony conviction against him when determining whether he was guilty of other charged offenses. The concern that defendants raise in this case, in contrast, is that the jury will hold one defendant's prior felony conviction against the other defendant when deciding whether each is guilty of a single felon-in-possession count. But this is precisely the concern that the principles of severance discussed in the Court's bench ruling address. Moreover, given the Court's finding that a limiting instruction will amply cure the effect of spillover prejudice in this case, the principles discussed in the Court's bench ruling that ordinarily preclude the bifurcation of a felon-in-possession count where only one defendant is on trial, apply with full force here.

Each defendant's motions for a severance and bifurcation are HEREBY DENIED.

## CONCLUSION

Each defendant's motions for severance; bifurcation; an order requiring the Government to stipulate to the prior felony conviction element of § 922(g)(1); additional discovery, including *Brady* material; and an order prohibiting the Government from introducing evidence of his prior similar acts, are HEREBY DENIED on the present record. As provided in the Court's bench ruling, the Court will accept a stipulation as to the fact of each defendant's prior felony conviction, and will consider at trial the admissibility of evidence of each defendant's prior similar acts.

Each defendant's motion to suppress evidence on the ground that he was arrested without probable cause is HEREBY DENIED.

Colon's motion to suppress his statements to law enforcement officials is HEREBY DENIED as to his first three statements to Officer Crowe. Colon's motion is HEREBY GRANTED as to any later statements, for use in the Government's case-in-chief.

Gonzalez's motion to suppress identification evidence against him is HEREBY DENIED. Gonzalez's motion to suppress his custodial statements is HEREBY DENIED as to all statements for impeachment purposes; HEREBY DENIED as to his last three statements, for use in the Government's case-in-chief; and HEREBY GRANTED as to his first two statements, for use in the Government's case-in-chief.

Each defendant's motion for permission to bring additional motions is HEREBY DENIED, except to the extent that defendants could not in the exercise of reasonable diligence have filed such motions prior to the issuance of this Order.

Defendants are HEREBY ORDERED to appear for trial before the Honorable Whitman Knapp, United States District Judge, Southern District of New York, on October 17, 1994, at 10:15 A.M.

SO ORDERED.