UNITED STATES of America, Appellee,

v.

Luis JARAMILLO, Defendant–Appellant.

No. 1307, Docket 93–1696.

United States Court of Appeals, Second Circuit.

Argued April 18, 1994.

Decided June 8, 1994.

Ellen M. Corcella, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty. for the Eastern District of New York, Peter A. Norling, Asst. U.S. Atty. on the brief), for appellee.

Bernard H. Udell, Brooklyn, NY, for defendant-appellant.

Before: OAKES, KEARSE, and MAHONEY, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Luis Jaramillo appeals from a final judgment of the United States District Court for the Eastern District of New York, 822 F.Supp. 118, convicting him, following his conditional plea of guilty before Eugene H. Nickerson, *Judge*, of violating 18 U.S.C. § 922(g) (1988), which makes it a crime for an unlawful alien to possess a firearm. Jaramillo was sentenced principally to 12 months' imprisonment, to be followed by three years of supervised release. On appeal, he argues that the district court erred in denying his motion to exclude the firearm from evidence on the ground that it had been obtained in violation of his rights under the Fourth Amendment to the Constitution. For the reasons below, we conclude that the circumstances relied on by the government to justify the search of Jaramillo were insufficient. We therefore vacate the judgment of conviction and remand for further proceedings.

## I. BACKGROUND

The present prosecution arose out of a January 1993 raid by law enforcement officers on the La Taverna bar in Queens, New York. During that raid, Jaramillo, a patron in the bar, was patted down and found to have a loaded .380 semi-automatic pistol concealed under his pants leg. An illegal alien, Jaramillo was indicted on one count of possession of a firearm in violation of 18 U.S.C. §§ 2, 922(g)(5), 924(a)(2), and 3551 *et seq.* (1988). He moved to suppress the gun on the ground that the search violated his Fourth Amendment rights. An evidentiary hearing was held on his motion.

### A. *The Other Gun*

At the suppression hearing, the sole witness was New York City Police Detective John Saager, who participated in the raid and described the events in detail. At approximately 11:30 on the night of January 21, some 15 law enforcement officers, including local police officers and members of a Drug Enforcement Administration Task Force, entered the bar "yelling police" (Transcript of Suppression Hearing March 19, 1993 ("Tr."), 11), "froze everybody up that was in the bar" (Tr. 6), and performed patdown searches on everyone.

Saager testified that the first officer to enter the bar was Police Detective Jerry Speziale. Upon entering the bar, Speziale saw one Blas Jimenez Ruibe–Cadavid ("Cadavid") take a handgun from his waistband and toss it into the lap of another person seated at his table; the second person promptly tossed the gun to the floor.

Q [by the Assistant United States Attorney ("AUSA")]. When Detective Speziale made that observation, what did he himself do and the other law enforcement people in the bar do in response to that?

. . . .

THE WITNESS: .... They went directly to those two people. I wound up going into the back also.

There was another person sitting at a table right next to those two people, and I wound up, I placed that guy up against the wall. Just as I did that, the defendant came out of the bathroom—

THE COURT: Which was the defendant? This is someone you haven't seen up until that point?

THE WITNESS: Up until that time, no.

Q. What happened when you observed—where was the defendant coming from and what happened after you saw him?

He was coming out of the bathroom and that's when I wound up, I grabbed him, I placed him up against the wall also.

Q. Now, meanwhile, what was happening with respect to the gun that had been observed by Detective Speziale, if you know?

A. Well, I didn't really see it cause [sic] I was more concerned with the two people on the wall, but later on—

(Tr. 7–8.) Saager testified that later, Speziale said he had recovered the gun thrown by Cadavid. After recovering the gun, Speziale arrested Cadavid and his companion.

Q. And then what happened with respect to the defendant who you were holding near the bathroom?

A. Then, for safety reasons Detective Speziale started searching the people that we had frozen in the bar. When he got to the defendant, he recovered a .380 from the defendant's right pants leg, underneath the defendant's pants leg.

(Tr. 8.)

In response to the AUSA's question as to whether "it was after seeing the gun, and as a result of that, that the other patrons in the nearby area were held against the wall to allow for the seizure" (Tr. 11), Saager testified:

It was almost simultaneously. You know, you're freezing everybody up, you know, in the area, you know.

Actually, everybody in the place was, you know, frozen up immediately.

Q. Upon the securing of the gun in the—

A. You know, even before the gun. As you're going in, as we're going into the bar, you know, like I said, we were yelling police. [Speziale] was the first one, I was the second one, and I know there was a couple of people we passed at the bar and I know some people were grabbing them and just, you know, placing them, you know, freezing the whole place for safety.

(Tr. 11–12.)

On cross-examination by Jaramillo's attorney Bernard Udell, Saager further testified as follows:

Q. At the time that those people tossed the weapon, is it fair to say that the defendant was in the bathroom?

A. Yes, sir.

Q. As far as you know, was the defendant in the bathroom at the time you entered the bar?

A. Yes, sir.

Q. Is it fair to say that when the defendant came out of the bathroom that was the first time you ever saw the defendant?

A. Yes, sir.

Q. Is it then fair to say that the defendant was secured as a result of the fact that he was another person in the bar?

A. Yes, sir.

Q. So whether that gun was tossed or not, the defendant upon showing his presence would have been secured?

A. He would have been secured, yes.

Q. And secured consisted of withholding his freedom of movement and patting him down?

A. Yes, sir.

Q. Now—

THE COURT: By the time he came out had the gun been tossed?

THE WITNESS: Yes, sir.

Q. You saw the gun being tossed?

A. I didn't—[Speziale] yelled. I didn't actually see the gun.

Q. Did you see the gun being retrieved?

A. I know it was being retrieved. [Speziale] and Senior Investigator Beech were immediately to my left, and they were retrieving the gun as I was placing somebody up against the wall that was at the table next to them.

Q. That somebody was not the defendant?

A. No, sir.

Q. And that was before the defendant came out of the bathroom?

A. Yes, sir.

Q. So is it fair to say that the gun was retrieved prior to the time the defendant came out of the bathroom?

A. Yes, sir.

Q. And by retrieved I mean retrieved by a police officer?

A. Yes, sir.

Q. So that gun had been secured when you first saw the defendant?

A. Yes, yes, sir.

(Tr. 16–17.)

The government relied solely on the tossed-gun incident to show that the agents had reasonable suspicion to conduct a pat-down search of Jaramillo. There was no testimony that Jaramillo was recognized by the officers, or acted in any suspicious manner, or was known to have any connection with Cadavid, the gun-tosser.

### B. *The Government's Eschewed Rationale*

The initial impetus for the officers' raid on La Taverna and their desire to begin immediately searching everyone in the bar was the officers' receipt of information from "a confidential source" suggesting that a "kidnapping and a killing" were to take place in the bar. (Tr. 12.) At the suppression hearing, however, the government chose not to rely on that information, apparently because it was unwilling to undergo exploration as to its source:

Q [by Mr. Udell]. Do you know the person who gave the confidential information?

Ms. Corcella [AUSA]: Your Honor, I am going to object.

The Court: I will let him answer yes or no. That won't identify him.

A. No.

Q. Have you ever had—have you ever personally had conversations with that person who gave that information?

A. No.

Q. Had you ever in the past relied on that person who gave that information?

Ms. Corcella: Your Honor, again, I am going to object. *The government's willing to rest on the events as they transpired in the bar.*

The Court: You're not depending on the fact that they had information about a killing and a kidnapping?

Ms. Corcella: I am. But I object to any further questions about the confidential source.

The Court: If that is part of your reliance, don't I have to know whether that confidential informant is reliable in some fashion?

Ms. Corcella: Yes, your Honor.

The Court: How am I going to know that on the basis of what you have presented so far?

Ms. Corcella: That is correct. And because of [the] situation surrounding the confidential source, it will be the government's position that we are willing to rely—it's the government's position that the police could enter the bar because it is a public access, whether they had information of criminal activity or not.

The Court: So you're not really relying on that?

Ms. Corcella: That is correct. And that in this particular instance, with respect to the defendant, the reason for the ability to stop this defendant was the sequence of events, the seeing of the gun and the fact of what transpires after, the urgency created by the seeing of that gun.

We will not rely upon the—

The Court: *Mr. Udell, I'm not considering at all the testimony that said they had information about a kidnapping and*

*a killing from a confidential informant before they went in.*

(Tr. 13–14 (emphasis added).)

### C. *The District Court's Decision*

Jaramillo argued that the gun seized from him should be excluded on the authority of *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), which, as discussed in Part II below, suppressed evidence obtained during the search of a bar patron while law enforcement officers were executing a warrant that authorized the search of the bar and one of its bartenders. In opposition, the government argued that the searches of the La Taverna patrons were authorized under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), because they constituted merely "a protective sweep" in order "to protect the police." (Tr. 19.)

In a Memorandum and Order dated June 1, 1993 ("District Court Order"), the district court reiterated that it would not consider Saager's testimony as to information received from a confidential informant, even though disregard of that information required the court to decide the motion "on an artificially restricted state of facts." District Court Order at 119. The court framed the question as

> whether, under all the circumstances, the officers' observation of two people tossing a gun around was enough to arouse a reasonable belief that there was a lively possibility of danger to the officers at the hands of defendant. Since the officers could see no gun on defendant, they had to draw an inference he had one. This court must decide whether that proposition of fact was sufficiently likely to be true as to justify a patdown.

*Id.* at 120.

The court found that there were grounds for reasonable suspicion that Jaramillo was armed and dangerous because

> the agents knew that at least one gun was in the La Taverna bar and that at least two of the patrons with a relationship to each other had sought to hide it. The place was a neighborhood bar in Corona, Queens County, where it would not be surprising if some of those who frequent it

are known to each other. It hardly seems unreasonable to suspect under the circumstances that a person who comes out of a men's room within a few feet of two gun handlers would have some connection with them and might also be armed.

*Id.* at 120. The court concluded that in "a contained area in which a gun had already been found on individuals possibly connected with the person patted down," the patdown was justified by a reasonable suspicion, "based on the facts the officers learned after entering the bar," that Jaramillo "was armed and dangerous." *Id.* at 121.

The court distinguished *Ybarra v. Illinois* as follows:

> The *Ybarra* case is not comparable. There no gun was present. Nothing was immediately evident that suggested violence. There was no suggestion that the bartender was armed or anyone else in the bar was armed to protect a major drug conspiracy or a large cache of heroin. The bartender gave every appearance of being a small time drug retailer.

District Court Order at 120–121.

After his motion was denied, Jaramillo conditionally pleaded guilty to violating § 922(g), reserving his right to seek review of the denial of the motion. He was sentenced as indicated above, and this appeal followed.

## II. DISCUSSION

Under *Terry v. Ohio* and its progeny, a law enforcement officer who can point to "specific and articulable facts which, taken together with rational inferences from those facts," would " 'warrant a man of reasonable caution in the belief' " that a brief investigative stop is appropriate, may make such a stop on less than probable cause to arrest. *Terry v. Ohio,* 392 U.S. at 21–22, 88 S.Ct. at 1880 (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)); *see, e.g., Alabama v. White,* 496 U.S. 325, 329, 110 S.Ct. 2412, 2415, 110 L.Ed.2d 301 (1990); *United States v. Sokolow,* 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). In connection with such a stop, the officer may "tak[e] steps to assure himself

that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry v. Ohio*, 392 U.S. at 23, 88 S.Ct. at 1881; *see, e.g., Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

■ "Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons'...." *Ybarra v. Illinois*, 444 U.S. at 93–94, 100 S.Ct. at 343. Under *Terry*, an officer may take necessary measures to determine whether the person is in fact carrying a weapon "[w]hen [the] officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Terry v. Ohio*, 392 U.S. at 24, 88 S.Ct. at 1881. "The 'narrow scope' of the *Terry* exception [to the Fourth Amendment's requirement of probable cause] does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked...." *Ybarra v. Illinois*, 444 U.S. at 94, 100 S.Ct. at 343. Thus, any invasion of a person's Fourth Amendment interests must be justified at least by "specific and articulable facts" directed to the person whose interests are to be invaded.

■ Circumstances giving rise to sufficiently "specific and articulable facts" to warrant the stop and patdown of an individual include instances where that individual has engaged in suspicious behavior, for example, by appearing to watch a certain store preparatory to robbing it, *see Terry v. Ohio*, 392 U.S. at 6–7, 88 S.Ct. at 1872, or appearing to be driving while intoxicated, *see Michigan v. Long*, 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983) (defendant drove erratically, ran his car into a ditch; as officers approached, defendant exited his car and approached the officers, appeared to be under the influence of alcohol or drugs, and ignored the officers' request for his car registration, instead returning toward his car). Such circumstances also include an individual's ownership or occupancy of private premises for which a search warrant has been obtained, *see, e.g., Michigan v. Summers*, 452 U.S. 692, 702–04, 101 S.Ct. 2587, 2594–95, 69 L.Ed.2d 340 (1981) (officers executing warrant for search of house may detain resident for duration of search); *Rivera v. United States*, 928 F.2d 592, 606–07 (2d Cir.1991); *United States v. Vigo*, 487 F.2d 295, 298 (2d Cir.1973) (upholding protective search of purse of passenger in car of person being arrested), or an individual's entry onto such premises while an authorized search is in progress, *see, e.g., United States v. Barlin*, 686 F.2d 81, 87 (2d Cir.1982); *United States v. Salazar*, 945 F.2d 47 (2d Cir.1991) (upholding patdown of an individual who, *inter alia*, matched informant's description of narcotics dealer and entered premises from which informant said drugs were being distributed), *cert. denied*, ⸺ U.S. ⸺, 112 S.Ct. 1975, 118 L.Ed.2d 574 (1992); *see also United States v. Patrick*, 899 F.2d 169, 171–72 (2d Cir.1990) (defendant's travel from Canada to the United States with companion found to be carrying cocaine sufficed to give probable cause for arrest). *Cf. Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990) (protective sweep of defendant's house incident to his arrest on a warrant for him and his suspected accomplice would be proper where specific and articulable facts warranted belief that the swept area harbored a dangerous individual); *United States v. Hernandez*, 941 F.2d 133, 137 (2d Cir.1991) (upholding protective sweep of those parts of an arrested defendant's apartment that were within the reach of another individual in the apartment).

None of the cases described in the preceding paragraph involved a defendant who was stopped in a public place and who had no known connection with the only person whom the officers had articulable grounds to suspect of wrongdoing. The Supreme Court considered the *Terry* exception's applicability to such circumstances in *Ybarra v. Illinois*.

In *Ybarra*, law enforcement officers had received information from a previously reliable informant that a certain bartender was selling heroin while working at the Aurora Tap Tavern, in Aurora, Illinois, and they obtained a warrant authorizing the search of the tavern and the bartender. An Illinois statute authorized officers executing such a warrant to search any person on the premis-

es in order to protect themselves from attack or to prevent the disposal or concealment of items described in the warrant. Executing the warrant for the Aurora Tap Tavern, the officers conducted patdown searches of each of the approximately one dozen customers present at the time, including Ybarra. The initial patdown of Ybarra revealed that he was carrying what felt like " 'a cigarette pack with objects in it,' " 444 U.S. at 88, 100 S.Ct. at 341 (quoting officer's testimony); some minutes later, the pack was seized, and it was eventually revealed to contain heroin. The State urged that the initial search of Ybarra be upheld on the basis that it was conducted on " 'compact' premises subject to a search warrant," where the police had a " 'reasonable belief' " that those searched were " 'connected with' " drug trafficking and might be " 'concealing or carrying away the contraband.' " *Id.* at 94, 100 S.Ct. at 344.

The Supreme Court rejected the State's contention and ruled that the searches of Ybarra and the seizure of what was in his pocket violated his rights under the Fourth Amendment. It pointed out that Ybarra had made no suspicious statements nor any gestures indicative of criminal conduct, and that "the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." *Id.* at 91, 100 S.Ct. at 342. The Court noted that,

> [u]pon seeing Ybarra, the[ police] neither recognized him as a person with a criminal history nor had any particular reason to believe that he might be inclined to assault them. Moreover, ... Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening.... In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous.

*Id.* at 93, 100 S.Ct. at 343. It stated that [t]he "narrow scope" of the *Terry* exception does not permit a frisk for weapons on

less than reasonable belief or suspicion *directed at the person to be frisked,* even though that person happens to be on premises where an authorized narcotics search is taking place.

*Id.* at 94, 100 S.Ct. at 343 (emphasis added). The *Ybarra* Court held that "a person's mere propinquity to others independently suspected of criminal activity" provides neither probable cause to search that person, *id.* at 91, 100 S.Ct. at 342, nor the basis for "a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons," *id.* at 92–93, 100 S.Ct. at 343.

■ Read as a group, therefore, the above cases stand for the proposition that a *Terry*-type patdown is permissible with respect to persons who are believed, on the basis of specific and articulable facts, to have behaved suspiciously or with respect to persons who own, occupy, or enter upon private premises on which the officers have the right to conduct a search or make a security check; but such a patdown is not permissible with respect to a person in a public place where the officers have no specific and articulable facts on which to base a suspicion of that person in particular. The difference lies in the fact that while it is obviously reasonable to believe that individuals in a private home or vehicle have some connection with one another, it is not reasonable to assume that all of the persons at a public bar have such a connection. The sole fact that an individual as to whom the officers have no reasonable and articulable factual suspicion of wrongdoing happens to be in a public place where another person possesses a weapon or contraband does not provide a basis for a *Terry*-type search if the possessor is a person with whom the searched individual has no known connection.

We think it plain that the present case is governed by *Ybarra,* which involved the search of an unsuspicious person in a public tavern, rather than the *Terry v. Ohio* and *Michigan v. Long* line of cases, which involved searches of persons engaging in suspicious behavior, or the *Michigan v. Summers* and *United States v. Barlin* line of cases,

which involved detentions or patdowns in connection with permissible searches of private homes. We also conclude that the government failed to show that there was any reasonable articulable suspicion directed toward Jaramillo in particular. The government presented no evidence that any of the agents had ever seen Jaramillo before or had any information about him, or that Jaramillo made any suspicious statements or any suspicious or threatening gestures. Nor was there any evidence that Jaramillo knew or had any connection with Cadavid, the tosser of the gun.

At oral argument, we pressed the government to state what facts were reasonably suspected with regard to Jaramillo. The AUSA could not point to any facts relating to Jaramillo and could say only that the agents were "concerned." In its brief on appeal, the government stated that "Judge Nickerson correctly found that Jaramillo posed a danger. The gun had not yet been recovered, and anyone in its proximity was thus a potential source of danger." (Government's brief on appeal at 8.) The factual assertion that the gun had not been recovered before Jaramillo came into view, however, is squarely contradicted by Detective Saager's testimony. Though Saager said that when the officers entered the bar they intended to freeze and pat down everyone in the bar even if there had been no tossing of a gun (Tr. 11–12), and that Jaramillo would have been searched even without that incident (Tr. 16)—actions that would have been constitutionally unjustifiable in the absence of the background information on which the government here eschewed reliance—Saager also testified unequivocally that by the time he saw Jaramillo, the gun had been recovered by other officers. Thus, he testified that Speziale and another officer

were retrieving the gun as I was placing somebody up against the wall that was at the table next to them.

Q. That somebody was not the defendant?

A. No, sir.

Q. And that was before the defendant came out of the bathroom?

A. Yes, sir.

Q. So is it fair to say that the gun was retrieved prior to the time the defendant came out of the bathroom?

A. Yes, sir.

Q. And by retrieved I mean retrieved by a police officer?

A. Yes, sir.

Q. So that gun had been secured when you first saw the defendant?

A. Yes, yes, sir.

(Tr. 17.) Thus, the government's factual premise that Jaramillo was patted down before the Cadavid gun was recovered is contradicted by the officer's testimony.

In fact, the district court did not rely on that ground. Rather, it found that the search of Jaramillo was justified on the ground that this was "a neighborhood bar ... where it would not be surprising if some of those who frequent it are known to each other," District Court Opinion at 120, that Jaramillo was "possibly connected" to Cadavid, *id.* at 121, and that "[i]t hardly seems unreasonable to suspect under the circumstances that a person who comes out of a men's room within a few feet of two gun handlers would have some connection with them and might also be armed," *id.* at 120. There having been no evidence whatever of the "possibl[e] connect[ion]," hypothesized by the district court, we reject this rationale as a matter of law. The court's reliance on its characterization of La Taverna as a neighborhood bar is insufficient to justify a search of all patrons. The mere possibility that a bar may generally be frequented by persons from a particular part of the city, and that "some" of the patrons are likely to know each other, does not mean that if one patron is seen engaging in suspicious activity it is reasonable to suspect all others. Nor is the fact that Cadavid's table was near the men's room from which Jaramillo emerged significant in the absence of any evidence of a connection between Jaramillo and Cadavid. That rationale would mean that if anyone known to be carrying a gun in a public bar or restaurant sits at a table anywhere near the restrooms, anyone who goes to the restroom may permissibly be patted down.

We conclude that the record developed at the suppression hearing was inadequate to support a conclusion that the agents knew of "specific and articulable facts" relating to Jaramillo sufficient to permit them to pat him down. Accordingly, the motion to suppress should have been granted, and the judgment of conviction must be vacated.

This case would perhaps have taken on an entirely different character if the government had relied on, and established the reliability of, the confidential information that initially led the agents to raid La Taverna. Trustworthy information of a planned kidnaping and execution could well provide a basis for a reasonable belief that there would be several armed persons on the premises and perhaps give rise to inferences as to other pertinent facts. In these unusual circumstances, therefore, we suggest that on remand the government be given an opportunity to have the suppression hearing reopened to permit it to present such evidence. We recognize that the government's desire to pursue the matter may be limited, since Jaramillo was sentenced in September 1993 to a 12-month term of imprisonment, which he has been serving.

## CONCLUSION

We have considered all of the government's arguments on this appeal and have found them to be without merit. The judgment of conviction is vacated, and the matter is remanded for further proceedings not inconsistent with the foregoing.

The mandate shall issue forthwith.