******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., with whom McDONALD, J., joins, dissenting. I respectfully dissent. When commenting on the power of government, Benjamin Franklin once said that "[t]hose who would give up essential [l]iberty, to purchase a little temporary [s]afety, deserve neither [l]iberty nor [s]afety." 6 Papers of Benjamin Franklin (L. Labaree ed., 1963) p. 242. Today, with the issuance of the majority opinion, I share Franklin's concerns.

In this case, we are asked to strike the balance between the rights of the police to be as safe as possible in the performance of their essential duties and the rights of citizens to be protected from unreasonable searches and seizures. I disagree with the majority's conclusion in part I of its opinion that, "when officers lawfully detain a suspect who they reasonably believe poses a threat to their safety, article first, §§ 7 and 9, permit the officers to briefly detain the suspect's companion for protective purposes." The majority strikes that balance, under the circumstances of this case, on the side of the police. In my view, there must be more indicia than "guilt by association" before the police can infringe upon fourth amendment rights. Accordingly, I respectfully dissent.

I agree with the majority that the police, under certain circumstances, have the right to perform a protective sweep in order to ensure their safety. Indeed, if the defendant, Jeremy Kelly, had been walking with the suspect and refused to leave when the suspect was stopped, I would agree with the majority that the police could have detained the defendant for their own protection. I part ways with the majority, however, on the premise that the police had an automatic right to detain the defendant. In my view, if they had been walking together, the police had to request that the defendant leave while they detained the suspect. Under the facts of this case, the situation becomes more of a police contrivance. The defendant was walking away from them and they ordered him to stop and come to them. If they had not said anything the defendant would have proceeded on his way while they detained the suspect and this situation would have never occurred. Therefore, in my view, the police have manufactured this safety excuse in order to justify a search that had its genesis in the initial illegal stop of the defendant.

I agree with the facts and procedural history set forth in the majority opinion. I do, however, highlight certain facts that are essential to my analysis and on which the majority and I agree. First, the defendant "was seized for state constitutional purposes when [Detective William] Rivera and [Lieutenant Jose] Angeles drove up alongside him, displayed their badges, and Rivera told him to approach their vehicle." Second, Rivera and Angeles

lacked reasonable and articulable suspicion that the defendant himself was engaged in criminal activity.

I agree with the majority that, on appeal to this court, the defendant claims that his seizure violated article first, §§ 7 and 9, of the Connecticut constitution and "does not seriously contest the conclusion of the Appellate Court that he was not seized for fourth amendment purposes until the police had probable cause to arrest him and, therefore, that his seizure did not violate the federal constitution." Therefore, "[t]he defendant's claim requires us to examine the scope of the rights afforded by the Connecticut constitution."

As the majority properly noted, "[i]n determining the contours of the protections provided by our state constitution, we employ a multifactor approach that we first adopted in *State* v. *Geisler*, [222 Conn. 672, 684, 610 A.2d 1225 (1992)]. The factors that we consider are '(1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms.' . . . *State* v. *Dalzell*, 282 Conn. 709, 716 n.6, 924 A.2d 809 (2007)." Like the majority, we agree that persuasive federal precedent is particularly relevant to our state constitutional inquiry.

I would conclude that *Ybarra* v. *Illinois*, 444 U.S. 85, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979), and *United States* v. *Jaramillo*, 25 F.3d 1146 (2d Cir. 1994), are analogous to the present case and provide the appropriate framework for considering the defendant's claim because those cases involve the search of an unsuspicious person in a public place.

First, in *Ybarra* v. *Illinois*, supra, 444 U.S. 87–89, the United States Supreme Court considered the motion to suppress evidence obtained during the search of a bar patron by law enforcement officers who were executing a search warrant. The search warrant authorized the search of the bar and one of its bartenders. Id., 88. During the search, seven or eight officers arrived at the bar, "announced their purpose and advised all those present that they were going to conduct 'a cursory search for weapons.'" Id. One of the officers then engaged in a patdown search of each of the patrons at the tavern. Id. The other officers engaged in an extensive search of the premises. Id. At the time of the search Ventura Ybarra was in front of the bar standing by a pinball machine. Id. During the first patdown of Ybarra, the officer felt what he described as " 'a cigarette pack with objects in it.'" Id. The officer did not remove the object from Ybarra's pocket, but continued patting down the other patrons. Id. After patting down the other patrons, the officer went back to Ybarra and frisked him again. Id., 89. During the second search of Ybarra,

which took place between approximately two and ten minutes after the first, the officer removed the cigarette pack from Ybarra's pocket. Id. Inside the pack he found six tinfoil packets, which later turned out to be heroin. Id.

The United States Supreme Court rejected the state's claim that it does not violate the fourth amendment "to permit evidence searches of persons who, at the commencement of the search, are on 'compact' premises subject to a search warrant, at least where the police have a 'reasonable belief' that such persons 'are connected with' drug trafficking and 'may be concealing or carrying away the contraband.' " Id., 94. Instead, the court focused on the following: "Upon entering the tavern, the police did not recognize Ybarra and had no reason to believe that he had committed, was committing, or was about to commit any offense under state or federal law. Ybarra made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers. In short, the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." Id., 90–91.

On the basis of the foregoing, the United States Supreme Court clarified that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Id., 91. Furthermore, the court in *Ybarra* further concluded that "[t]he initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this [c]ourt has invariably held must form the predicate to a patdown of a person for weapons." Id., 92–93. Accordingly, the United States Supreme Court concluded that "the searches of Ybarra and the seizure of what was in his pocket contravened the [f]ourth and [f]ourteenth [a]mendments." Id., 96.

Second, I find the reasoning and rationale of the Second Circuit Court of Appeals in *United States* v. *Jaramillo*, supra, 25 F.3d 1146, to be instructive in the present case. In *Jaramillo*, the defendant sought to exclude a firearm from evidence on the ground that it had been obtained in violation of his rights under the fourth amendment. Id., 1147. The firearm was obtained during a raid by law enforcement officers at a bar. Id. During the course of the raid, one patron took a handgun from his waistband and tossed it into the lap of another person seated at his table and that person tossed the handgun onto the floor. Id. As the officer approached those two people and ordered them against the wall, the defendant emerged from the bathroom. Id., 1147–48. When the defendant emerged from the

bathroom, the officer grabbed him and placed him up against the wall. Id., 1148. When the officer patted down the defendant, he discovered a firearm underneath the leg of his pants. Id.

The Second Circuit reviewed *Terry* v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and its progeny, concluding that "any invasion of a person's [f]ourth [a]mendment interests must be justified at least by 'specific and articulable facts' directed to the person whose interests are to be invaded." *United States* v. *Jaramillo*, supra, 25 F.3d 1151. The Second Circuit then relied on the Supreme Court's analysis in *Ybarra*, and concluded that the cases "stand for the proposition that a *Terry*-type patdown is permissible with respect to persons who are believed, on the basis of specific and articulable facts, to have behaved suspiciously or with respect to persons who own, occupy, or enter upon private premises on which the officers have the right to conduct a search or make a security check; but such a patdown is not permissible with respect to a person in a public place where the officers have no specific and articulable facts on which to base a suspicion of that person in particular." Id., 1152. The Second Circuit then concluded "[w]e think it plain that the present case is governed by *Ybarra*, which involved the search of an unsuspicious person in a public tavern, rather than the *Terry* v. *Ohio* [supra, 1] and *Michigan* v. *Long* [463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)] line of cases, which involved searches of persons engaging in suspicious behavior, or the *Michigan* v. *Summers* [452 U.S. 692, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981)] and *United States* v. *Barlin* [686 F.2d 81, 87 (2d Cir. 1982)] line of cases, which involved detentions or patdowns in connection with permissible searches of private homes." *United States* v. *Jaramillo*, supra, 1152–53.

Applying that rationale to the facts of *Jaramillo*, the Second Circuit determined that the government had failed to show that there was any reasonable articulable suspicion to Jaramillo in particular, where the agents did not know him, had no information about him, and where Jaramillo did not make any suspicious statements or threatening gestures. The Second Circuit also pointed to the fact that there was no evidence that Jaramillo had any connection to the man who tossed the gun. Id., 1153. Accordingly, the Second Circuit concluded that the motion to suppress should have been granted. Id., 1154.

The Third Circuit Court of Appeals and Fourth Circuit Court of Appeals have also recently relied on and applied the rationale of *Ybarra* on facts similar to the present case. First, in *United States* v. *Navedo*, 694 F.3d 463, 468–69 (3d Cir. 2012), the Third Circuit determined that the seizure of an individual, Alexander Navedo, who police had seen talking with another individual

who was in possession of a handgun was impermissible under the fourth amendment. The court relied on the fact that "police did not have any information from any source that would have supported a reasonable suspicion that Navedo was involved in firearms trafficking or that he intended to purchase a gun from [the suspect who was seen holding the gun]. As we have just noted, the officers knew of nothing that would have suggested Navedo was connected to any prior criminal activity. His residence at 315 Park Avenue was not even the focus of police surveillance. That surveillance was aimed at the building at 323 Park Avenue. A shooting had been reported at that address, and the shooting was not even that recent. The stop here appears to be based on nothing more than an attempt to transfer the reasonable suspicion the police had as to [the suspect] onto Navedo." (Footnote omitted.) Id.

Second, the Fourth Circuit also found a seizure of a companion without reasonable suspicion related to that individual to violate the fourth amendment in *United States* v. *Black*, 707 F.3d 531, 539 (4th Cir. 2013). In reaching its conclusion, the court reasoned as follows: "Here, the totality of the factors outlined by the [D]istrict [C]ourt—an individual's presence at a gas station; prior arrest history of another individual; lawful possession and display of a firearm by another; [the defendant's] submission of his [identification] showing an out-of-district address to [the police officer], all of which occurred in a high crime area at night—fails to support the conclusion that [the police officer] had reasonable suspicion to detain [the defendant]." Id.

I would conclude that the facts of the present case are most similar to *Ybarra* and its progeny, because the present case involves the detention of an unsuspicious person in a public place. Like the defendants in *Ybarra*, *Jaramillo*, *Navedo*, and *Black*, the defendant in the present case did not engage in any suspicious behavior and the police did not have any specific information about him or know the nature of his relationship with the suspect.[1]

I would agree with the majority that the police would have been entitled to detain the defendant if they had asked him to leave while they detained his companion, and he refused. The refusal to leave alone, in my view, would have been enough to constitute reasonable suspicion of the defendant. Under the facts of this case, however, the police contrived this situation and then used the safety reason as an excuse for the detention. The defendant was walking in the driveway of a house. Instead of asking only the suspect to stop, the police ordered both to halt. It was at this stage that the defendant was seized. The police were several feet away when they issued this order. The defendant responded that he lived in the house.[2] The police had no authority to yell halt to the defendant.

This is not a situation where the police received information that two people had committed a crime nearby a short time ago and they had a good description of one such that it would be reasonable to detain the other. Nor, is it like the case cited by the majority, *Trice* v. *United States*, 849 A.2d 1002, 1004 (D.C. 2004), in which the police received information that there had been a stabbing at a local hospital and two minutes later saw two men, including one who fit the description of the suspect, walking near the location of the stabbing. In that type of case, the companion's presence with a suspect in such geographic and temporal proximity creates a reasonable suspicion of the companion, as either a participant in or a witness to criminal activity. Id., 1008. In finding the search of the companion permissible in *Trice*, the court reasoned as follows: "As he was walking with [the suspect, Tyrone Trice] appeared to be the companion of a potentially violent, fleeing criminal and not a mere bystander. Moreover, given the recency of the crime, it was reasonable to think that if [the suspect] committed it, his companion Trice likely was aware of that fact and was a witness if not also an accomplice or an accessory after the fact." Id.

None of the facts that allowed for the seizure of the companion in *Trice* are involved in the present case. The police only had information that Pedro Gomez was wanted for a violation of probation charge. There was no information that the crime had happened recently so as to make the defendant either a witness or accomplice or accessory after the fact. Therefore, unlike *Trice*, the present case involves a stop predicated solely on the basis of association. As the Fifth Circuit Court of Appeals has noted, "[l]est there be any doubt, we state here that 'reasonable suspicion' must be specifically directed to the person to be searched. While in narrowly limited circumstances the degree of suspicion as to an already suspicious individual may be somewhat enhanced by virtue of suspicious activity by a closely linked traveling companion at the border . . . the fourth amendment does not permit any automatic or casual transference of 'suspicion.' " (Citation omitted; footnote omitted.) *United States* v. *Afanador*, 567 F.2d 1325, 1331 (5th Cir. 1978).

The majority acknowledges that the seizure of the defendant in the present case is impermissible under *Terry* v. *Ohio*, supra, 392 U.S. 1, and its progeny. I agree.

Nevertheless, the majority explains that "[t]he mere fact that the suspicionless detention of a suspect's companion cannot be justified under *Terry* does not resolve the issue before us, however, because such a detention otherwise may be reasonable for fourth amendment purposes. Indeed, the United States Supreme Court has used the same balancing approach that it applied in *Terry* in concluding that certain warrantless searches and seizures pass muster under the fourth amendment

even though they are not supported by probable cause or reasonable suspicion." The majority then relies on *Michigan* v. *Summers*, supra, 452 U.S. 693–94 (holding that, for purposes of fourth amendment, police executing search warrant for home may detain occupants during search), *Maryland* v. *Buie*, 494 U.S. 325, 327–28, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990) (while effecting arrest of suspect in his home pursuant to arrest warrant, officer may conduct warrantless protective sweep of all or part of premises), and *Maryland* v. *Wilson*, 519 U.S. 408, 415, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997) ("an officer making a traffic stop may order passengers to get out of the car pending completion of the stop"). I respectfully disagree with the majority's reliance on these cases. I take each in turn.

First, I do not agree that the United States Supreme Court did not require reasonable suspicion regarding the defendant in *Michigan* v. *Summers*, supra, 452 U.S. 692. To the contrary, I would conclude that the United States Supreme Court determined that the state established specific and articulable facts directed to the defendant in *Summers* by virtue of the fact that he was an occupant in the home for which the police had a warrant. Id., 703.

Indeed, in *Michigan* v. *Summers*, supra, 452 U.S. 703–704, the United States Supreme Court specifically addressed the reasonable suspicion the officers had directed to the defendant. The United States Supreme Court reasoned as follows: "It is also appropriate to consider the nature of the articulable and individualized suspicion on which the police base the detention of the occupant of a home subject to a search warrant. We have already noted that the detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant. The existence of a search warrant, however, also provides an objective justification for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. *The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.*" (Emphasis added; footnote omitted.) Id.

Second, in *Maryland* v. *Buie*, supra, 494 U.S. 325, the United States Supreme Court did not state that a reasonable suspicion about a companion was unnecessary. Indeed, *Buie* did not even involve a companion, but instead was a motion by the defendant, for whom the officers had a valid warrant for his arrest, to suppress evidence that was found in the basement of his

home during a protective sweep of the home incident to his arrest. Id., 328. While in the defendant's home to execute the warrant for his arrest, the defendant eventually emerged from the basement. Id. In response, the police entered the basement to do a protective sweep, in case there was anyone else in the basement. Id. The defendant filed a motion to suppress the evidence found in the basement on the ground that the police violated the fourth amendment by entering the basement without a warrant after arresting the defendant. Id.

Although *Buie* did not deal with whether the police needed a reasonable suspicion about a companion, the United States Supreme Court did address whether the police needed a reasonable suspicion to enter the basement. In doing so, the United States Supreme Court, specifically stated as follows: "We conclude that the [f]ourth [a]mendment would permit the protective sweep undertaken here if the searching officer possesse[d] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing . . . that the area swept harbored an individual posing a danger to the officer or others." (Citations omitted; internal quotation marks omitted.) Id., 327. The United States Supreme Court further explained that, "[w]e agree with the [s]tate . . . that a warrant was not required. We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry* and *Long*, and as in those cases, we think this balance is the proper one.

"We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." (Footnotes omitted.) Id., 334–36. In allowing for the protective sweep, the United States Supreme Court reasoned that "unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Id., 333.

Third, I also disagree with the majority's reliance on *Maryland* v. *Wilson*, supra, 519 U.S. 408, which involved whether passengers in a motor vehicle could be required to exit the vehicle. In *Wilson*, a state trooper stopped a motor vehicle for speeding and not having a regular license plate. Id., 410. Once the car stopped, the driver voluntarily exited the vehicle and appeared very nervous. Id. The trooper ordered the driver back into the vehicle and asked him to provide the rental papers. Id., 410–11. During this time, the trooper noticed that the front seat passenger, Jerry Lee Wilson, was sweating and also appeared extremely nervous. Id. While the driver was seated in the vehicle looking for the rental papers, the trooper ordered Wilson out of the car. Id., 411. When Wilson exited the vehicle, a bag filled with crack cocaine fell to the ground. Id. Wilson was then arrested and charged with possession of cocaine with intent to distribute. Id. Wilson filed a motion to suppress the evidence, claiming that the trooper violated the fourth amendment when he ordered Wilson out of the vehicle. Id.

In *Wilson*, the United States Supreme Court balanced the serious dangers presented to officers during motor vehicle stops with the minimal additional intrusion on passengers of an already stopped vehicle. Id., 413–14. The United States Supreme Court reasoned that "as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car." Id. The United States Supreme Court, therefore, concluded as follows: "[D]anger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal. We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Id., 414–15.

In concluding that the trooper did not violate Wilson's fourth amendment rights by ordering him out of the vehicle, the United States Supreme Court noted that Wilson was "subjected to no detention based on the stopping of the car once he had left it." Id., 415 n.3. The United States Supreme Court refused to address the state's request that they "go further and hold that an officer may forcibly detain a passenger for the entire duration of the stop." Id.

On the basis of the foregoing, I disagree that the United States Supreme Court precedent supports the majority's position. These cases are distinguishable from the facts of the present case in that the subject of the search in these cases is a car or a house—a

confined area—and the subjects are detained for: (1) police safety; (2) to prevent the removal of evidence; and (3) their known association to the subject of a warrant. In the present case, the defendant was detained in an open area where police could have avoided the safety issue by letting the defendant proceed on his way, there was no possibility that the defendant would have been able to remove evidence, and the police did not have knowledge of his relationship with the suspect beyond the fact that they were walking together for a brief period of time.

As the Second Circuit reasoned, "[t]he difference lies in the fact that while it is obviously reasonable to believe that individuals in a private home or vehicle have some connection with one another, it is not reasonable to assume that all of the persons [in a public place] have such a connection. The sole fact that an individual as to whom the officers have no reasonable and articulable factual suspicion of wrongdoing happens to be in a public place where another person possesses a weapon or contraband does not provide a basis for a *Terry*-type search if the possessor is a person with whom the searched individual has no known connection." *United States* v. *Jaramillo*, supra, 25 F.3d 1152.

I also disagree with the majority's reliance on *United States* v. *Lewis*, 674 F.3d 1298, 1309 (11th Cir. 2012), as support for its holding in the present case. As the majority explains, in *Lewis*, two police officers encountered four men in a parking lot, one of whom was the defendant, Omar Lewis. Id., 1300. When asked if they were carrying firearms, two of the men, not including Lewis, responded in the affirmative. Id. One of the men responded that he had a handgun on his person. Id. The majority neglects, however, to mention an important fact—one of the men indicated that there was a handgun in the backpack in the open trunk of a car parked nearby. Id. The car was in such close proximity that one of the police officers could see the top of the backpack. Id. It was only at this point that the officers drew their weapons, ordered all four men to sit down on the ground and show their hands, thereby seizing them for purposes of the fourth amendment. Id., 1301.

In concluding that the seizure of the men in the parking lot was reasonable, the Eleventh Circuit Court of Appeals determined that "[t]he officers faced substantial, immediate danger when confronted with the *known possession* of two firearms." (Emphasis added.) Id., 1306. In applying the balancing test, the Eleventh Circuit reasoned that "[t]he reasonableness of the officers' conduct under the totality of the circumstances was heightened greatly by the admitted presence of two firearms, which posed a serious risk to the safety of the officers as well as the other individuals present in the crowded parking lot." Id., 1308.

Although I agree with the majority that the Eleventh

Circuit "focused on the specific dangers associated with firearms . . . ." I disagree that the safety concerns present in *Lewis* are applicable to the present case. In *Lewis*, the police officers were faced with the known possession of two firearms in a crowded parking lot, one of which was on the person of a suspect and one that was "well within the reach of all four individuals at the time the officers drew their weapons." *United States* v. *Lewis*, supra, 674 F.3d 1309. In the present case, nothing in the record indicates that the police officers had a reasonable belief that the suspect was armed at the point they encountered him on the street.[3] In determining whether the officers in the present case had a reasonable concern for their safety, that distinction is dispositive. In *Lewis*, the Eleventh Circuit was clear that "under the totality of the circumstances . . . the officers were entitled to control the scene and exercise command over the situation in the course of briefly detaining [the individual who admitted to carrying a handgun on his person] for further investigation. A brief detention of all four associated individuals was reasonable, in light of the substantial risks to the officers' safety." Id. Under the totality of the circumstances in the present case, I would conclude that the detention of the defendant was not reasonable because the state did not demonstrate a substantial risk to the officers' safety.

I also disagree with the majority's reliance on *Commonwealth* v. *Rucker*, Superior Court of Massachusetts, Essex County, Docket No. 06-00530, 2006 WL 4323674, *4 (November 27, 2006) ("when an officer legitimately comes into contact with the companion of the target of a *Terry* stop, particularly when the stop is related to a crime of violence or involves firearms, [he] may [stop and] frisk the suspect's companion if [he] consider[s] [the companion] dangerous, even if [he does] not have reasonable, articulable grounds to stop [the companion] for suspicion of criminal activity"), *State* v. *Drury*, 358 S.W.3d 158, 163 (Mo. App. 2011) ("[p]rotective detention is reasonable when it is for a limited duration, and when the individual's presence could create a risk of harm to the officer, the individual detained, or the public at large, even if the officer has no reason to believe the individual would intentionally cause harm"), *State* v. *Sparr*, 13 Neb. App. 144, 153, 688 N.W.2d 913 (2004) (officer's actions were reasonable when, while seizing driver of one vehicle that was already stopped, he detained driver of nearby vehicle as safety precaution), and *United States* v. *Maddox*, 388 F.3d 1356, 1367–68 (10th Cir. 2004) (permitting protective detention of arrestee's companions incident to his arrest when officers have reasonable safety concerns), cert. denied, 544 U.S. 935, 125 S. Ct. 1689, 161 L. Ed. 2d 504 (2005). In each of these cases, the officers were able to point to particularized facts about the companion that amounted to a reasonable fear for their safety

related to the presence of the companion. In the present case, the officers do not allege any particularized facts about the defendant that caused them to reasonably fear for their safety, only facts related to the suspect. Accordingly, I find the majority's reliance on these cases to be misplaced.

I agree with the majority that the police have a legitimate interest in protecting themselves. There must be, however, some restrictions placed on the intent. In my view, there are several potential unconscionable ramifications to the majority opinion. For instance, if a suspect with an outstanding warrant is talking to his neighbor's family near the property line, can the police now detain the entire family as part of the encounter with the suspect? If the suspect is waiting at a bus stop with six other strangers, can they all be detained?[4] If the same suspect is observed leaving a house and stopped in the front yard, can the police now seize everyone in the house to ensure that no one will shoot them while they question the suspect? What if the suspect is detained in a neighborhood known to have a high incident of crime, can the police now seize everyone in the entire neighborhood to ensure their safety while they detain the suspect? There simply is no definition of who is a "companion" in the majority opinion. I would require more than mere "guilt by association." Ever mindful of Franklin's admonition, we cannot use the omnipresent specter of safety as a guise to authorize government intrusion. Therefore, I respectfully dissent.

[1] The majority indicates that "we are particularly puzzled by [this] dissent's reliance on *Ybarra* v. *Illinois*, supra, 444 U.S. 85, and its progeny. . . . Because our decision in the present case permits only the brief *detention* of the defendant and does not entail or authorize a *search* of the defendant . . . ." (Emphasis in original.) I respectfully disagree. *Summers* involved a premises search in a private home whereas *Ybarra* involved a public place, a tavern. The Supreme Court noted in *Summers* that "[t]he connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Michigan* v. *Summers*, supra, 452 U.S. 703–704. Further, many of the cases cited in this opinion namely: the Second Circuit's decision in *Jaramillo*, the Third Circuit's decision in *Navedo*, and the Fourth Circuit's decision in *Black*, all concerned detentions of nonsuspects in public places. All of these cases were decided after both *Ybarra* and *Summers* and they all engaged in a *Ybarra*-type analysis while citing *Ybarra*. *Navedo* actually involved a case where the police had observed Navedo's companion with a gun on the front porch of a multiunit building located in a mixed residential and industrial neighborhood. *United States* v. *Navedo*, supra, 694 F.3d 477. When the police approached the two men, the suspect ran in one direction and Navedo ran up the stairs to his home with one officer pursuing him. As he chased Navedo, the officer yelled "[p]olice" and "stop." Id., 466. After climbing two flights of stairs, Navedo reached the third floor and attempted to open the door to his apartment. Id. He was then tackled by the officer. Id. The officer testified that the door had been opened at the time he tackled Navedo, and he observed a shotgun, two long rifles on the bed, one of the floor, and a stock of ammunition on the floor. Id. Navedo was charged with illegally possessing the weapons that were recovered from inside his apartment, and those weapons were admitted against him to support the sole count upon which he was tried and convicted. Id., 467. The Third Circuit opined that "[t]he reasonable suspicion required under *Terry* is specific to the person who is detained. The circumstances 'must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.' *United States* v. *Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). The Supreme Court has never viewed *Terry* as a

general license to detain everyone within arm's reach of the individual whose conduct gives rise to reasonable suspicion. Rather, the [c]ourt has stressed that 'this demand for specificity in the information upon which police action is predicated, is the central teaching of this [c]ourt's [f]ourth [f]mendment jurisprudence.' Id. [quoting *Terry* v. *Ohio*, supra, 392 U.S. 21 n.18]" . . . . (Emphasis omitted.) *United States* v. *Navedo*, supra, 468. The Third Circuit further stated that "[a]lthough the [c]ourt in *Ybarra* was discussing probable cause to arrest rather than the reasonable suspicion for a stop under *Terry*, the [c]ourt's pronouncement is equally applicable to this situation. See *Brown* v. *Texas*, 443 U.S. 47, 49–52, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979)." *United States* v. *Navedo*, supra, 469. In words that apply equally to the present case, the Third Circuit further stated that "[w]e do not suggest that the officers had to sit idly by without approaching and investigating merely because they could not be certain about what was transpiring. However, given the limitations on investigative detentions under *Terry*, and the [c]ourt's clear pronouncement in *Cortez*, they could not detain Navedo merely because their reasonable suspicions justified a brief investigative detention of [the suspect]." Id., 468. "[A] person whom police approach is free to avoid a potential encounter with police by leaving the scene, and the rate of acceleration of the person's gate as [he or she leaves] is far too ephemeral a gauge to support a finding of probable cause, absent some other indicia of involvement in criminal activity." Id., 474. Thus, the court held that the police had no reason to suspect that Navedo was himself involved in criminal activity, and even if they had appropriately formed such a suspicion, they would have been entitled only to detain and investigate, not arrest. The court, therefore, concluded "that the police lacked probable cause to arrest Navedo under the circumstances here and that the District Court erred in denying his motion to suppress the physical evidence that was seized following that arrest." Id. The majority maintains that "neither the defendant nor the dissent has identified a single case in which a court, either federal or state, has determined that such a protective stop of the companion was unreasonable." In my view, *Navedo* supports the conclusion that the stop in the present case was unreasonable. In fact, *Navedo* is a much stronger case for the state's position in view of the presence of a gun observed by the police, yet the state's argument was rejected in *Navedo*. As articulated by the trial court in the present case, there was no indication of firearms in the violation of probation warrant, and no firearms were observed at the scene.

The majority maintains that, in the present case, "the dissent fails to explain why the state's interest in the safety of the investigating officers did not outweigh the relatively minimal intrusion into the defendant's liberty interest." In my view, without some justification, there can be no "minimal intrusion" into a liberty interest. When we engage in such semantics, I believe that we begin the process of eroding essential constitutional rights.

[2] I note that the record in the present case is not clear as to whether the defendant, in fact, lived in the house.

[3] In fact, the trial court initially found that the suspect had an outstanding warrant for the offense of "felony . . . possession of a firearm," which was incorrect. The trial court, in response to this court's articulation request, corrected its erroneous finding to the effect that the suspect was the subject of an "active felony warrant for violation of probation."

[4] I note that, during oral argument before this court, the state suggested that this question should be answered in the affirmative.